IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRYCE M. BAKER, | § | |
| | § | No. 433, 2023 |
| Petitioner Below, | § | |
| Appellant, | § | Court Below—Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | File No. CN22-04227 |
| SIENNA BAKER, | § | Petition No. 22-20499 |
| | § | |
| Respondent Below, | § | |
| Appellee. | § | |

Submitted: July 24, 2024
Decided: August 14, 2024

Before **SEITZ**, Chief Justice; **TRAYNOR** and **GRIFFITHS**, Justices.

## ORDER

On this 14th day of August 2024, it appears to the Court that:

(1)    After consideration of Bryce M. Baker ("Father") and Sienna Baker's ("Mother") competing petitions for custody of their child Bryce Baker, Jr. ("Child"), the Family Court awarded primary residential placement of Child to Mother.[1]  Father now appeals, arguing that the court improperly relied upon an expert report regarding Mother's mental health and made two erroneous factual findings.  We disagree and affirm.

---

[1] *See* Opening Br., Ex. A at 11 [hereinafter "*Fam. Ct. Order*"].  The parties and their minor child have been assigned pseudonyms under Supreme Court Rule 7(d).

(2) Mother and Father are the divorced parents of Child. Before the divorce, they lived together as a family. After the divorce, Mother lived with Child in her parents' home in Delaware, while Father was stationed in New Hampshire with the Air Force. After a few months under this arrangement, Father through counsel filed a petition for custody of Child in the Family Court seeking primary residential placement. In response, Mother through her own counsel filed a competing petition for custody, seeking to maintain primary residential placement of Child in Delaware.

(3) The testimony at the hearing on the parties' custody petitions showed that both Mother and Father had the resources, ability, and desire to care for Child. Testimony further showed that Child loved his parents and was well adjusted to their respective homes. Despite this, both parties expressed concerns regarding their counterpart's present ability to provide a stable home for Child.

(4) Mother's concerns focused on whether the military would require Father to re-locate, uprooting Child if placed primarily with Father. Father testified that his assignment in New Hampshire was indefinite and "non-deployable . . . till minimum of 2025."[2] According to Father, there are "provision[s] in Air Force regulations about assignments for single parents[,]" that he believed made his

---

[2] App. to Answering Br. at B134.

reassignment unlikely.[3]  When pressed on whether his reassignment was still possible—Father admitted that it was—saying that his proffered scenarios were "hypotheticals[.]"[4]  Testimony further showed that Father had been deployed to at least two other Air Force bases, one in Italy and one in South Korea, since 2021.

(5)    Mother also focused on Father's ability to parent while working for the Air Force.  During the hearing, Father testified that he lived alone but that an Air Force "Family Care Plan" was in place that would require his supervisor to deliver Child to Mother if he could not care for Child.  Father also testified that he had recently gone on a voluntary three-day work trip to Portugal for the Air Force.

(6)    For his part, Father's concerns focused on his belief that Mother's mental health was unstable.  Because Father did not request a mental health evaluation of Mother before the hearing, he could not offer evidence relating to the current state of Mother's mental health.  Father testified that, during and immediately after their time living together, Mother had often told him that she was depressed, not a "good mom[,]" and "about to end up in the mental hospital or have a mental breakdown[.]"[5]  In one instance, Mother sent Father a text message that her inability

---

[3] *Id.* at B103.

[4] *Id.*

[5] *Id.* at B81–82.

3

to manage Child's behavior had led her to resort to physical discipline. She also confided in Father that she was experiencing suicidal ideation.

(7) Following Father's testimony regarding Mother's mental health, the court asked why Father had not sought a mental health evaluation for Mother. The court noted that, with Father presenting only evidence of Mother's past mental health struggles during the hearing, it did not have enough information to determine whether Mother was currently suffering from any mental illness. When Father said he had not sought an evaluation due to lack of funds, the court offered to order a mental health evaluation with the parties sharing the cost. With a report in hand, the court believed it could confidently make a decision on the best placement for Child. Father accepted the court's offer.[6] The parties negotiated the form of order and jointly submitted it to the court for approval.

(8) The Family Court issued the order for the evaluation, requiring Dr. Rachel Brandenburg to evaluate Mother's mental health. Specifically, Dr. Brandenburg was to determine whether Mother was currently suffering from any mental illness and, if so, whether it affected Mother's ability to parent Child. Dr. Brandenburg was to record her findings and conclusions in a written report. The report was to be shared with the parties, who were to promptly share it with the court.

---

[6] *See id.* at B247 ("The Court: And does Father want Mother to get a mental health evaluation? That can still be done. . . . [Father's Counsel]: I think that would be delightful.").

4

(9)     On September 20, 2023, the parties received Dr. Brandenburg's report, which Mother transmitted to the Family Court that same day.  Her report concluded that Mother did not currently meet the criteria for a mental health diagnosis.  Dr. Brandenburg's report also opined that there is "no reason to believe that any mental health diagnosis plays a role in [Mother's] ability to parent."[7]   The report's conclusions were based on interviews with Mother and Father, three diagnostic tests administered on Mother, text messages sent between the parties, and a 2022 petition for a protection from abuse order Mother had filed against Father.  The report also included summaries of the parties' statements made during their interviews with Dr. Brandenburg and the results of the diagnostic tests.

(10)   On October 20, 2023—thirty days after the parties received Dr. Brandenburg's report and having received no objection to the report from Father— the Family Court issued its letter decision and order.  After weighing the statutory best interest factors as set forth in 13 *Del. C.* § 722(a),[8] the Court granted primary residential placement of Child to Mother.[9]  The court's decision rested upon best

---

[7] *Id.* at B352–53.

[8] The 13 *Del. C.* § 722(a) best interest factors are:  (1) "[t]he wishes of the child's parents . . . ;" (2) "[t]he wishes of the child . . . ;" (3) the strength of child's familial and personal relationships, (4) "[t]he child's adjustment to [their] home, school and community;" (5) "[t]he mental and physical health of all individuals involved;" (6) each parent's compliance with their rights and responsibilities as to child; (7) evidence of domestic violence; and (8) "[t]he criminal history of any party of any other resident" of their household.

[9] *Fam. Ct. Order* at 11.

interest factors three (child's relationship with parents and extended family) and four (child's adjustment to his home, school, and community). As to factor three, the court noted that Mother, because she lived with her parents, had a better support system than Father, who lived alone. The court believed this to be an issue because "Father admitted that he has had to travel internationally since he moved to New Hampshire and did not appear to have a childcare plan involving persons well known to [Child]."[10] As to factor four, the court found that Child was well situated in Delaware and Father had "admitted that he could be relocated to another base at any time forcing [Child] to adjust to a new environment and community if Father were awarded primary residence."[11]

(11) The court found the factors relating to Mother's mental health—best interest factors five (the mental and physical health of all individuals involved) and seven (evidence of domestic violence)—to be neutral. As to factor five, the Family Court held that, based on Dr. Brandenburg's conclusions contained in her report, Mother had no current mental health issues that prevented her from parenting Child. As to factor seven, the Family Court relied upon Dr. Brandenburg's report and

---

[10] *Id.* at 4.

[11] *Id.* at 6.

Mother's interview statement that she was "against physically disciplining children" to find that Father's concern of future violence was unfounded.[12]

(12)  On appeal, Father argues that the Family Court committed three errors that require reversal.  First, Father argues that the Family Court erred when it relied on Dr. Brandenburg's expert report and Mother's interview statements contained therein in making its custody determination.  Next, Father contends that the Family Court erred when it found that "Father admitted that he has had to travel internationally since he moved to New Hampshire."[13]  And lastly, Father argues that the Family Court erred when it found that "Father . . . admitted that he could be relocated to another base at any time forcing [Child] to adjust to a new environment and community if Father were awarded primary residence[.]"[14]

(13)  First, the Family Court's reliance on Dr. Brandenburg's expert report and Mother's statements contained in it was not error.  Where, as here, no objection is made to the admission of evidence below, we review for plain error.[15]  Plain error exists when the error complained of is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[16]  Here, even if Dr.

---

[12] *Id.* at 10.

[13] *Id.* at 4.

[14] *Id.* at 6.

[15] *Michaels v. Gregory*, 935 A.2d 256, 2007 WL 2702811, at *2 (Del. Sept. 18, 2007) (ORDER) (citing *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).

[16] *Wainwright*, 504 A.2d at 1100.

Brandenburg's report and Mother's statements contained therein were excluded, Father's substantial rights were not prejudiced because best interest factors five and seven would have still been considered neutral. As noted by the Family Court, the evidence presented at the hearing by Father showing Mother's prior mental health issues was "insufficient" to allow the court "to know where she stands today" regarding any mental illness that would affect her ability to parent Child or increase the likelihood of domestic violence.[17] Stated differently, for all intents and purposes, the report did not "move the needle" from where it sat at the conclusion of the hearing on the parties' cross-motions.

(14) Next, the Family Court did not err when it found that Father could not guarantee his consistent availability to care for Child. "If the Family Court has correctly applied the law, our review is limited to abuse of discretion."[18] "To the extent that the issues on appeal implicate rulings of fact, we review the factual findings of the Family Court to assure that they are sufficiently supported by the record and are not clearly erroneous."[19] "We will not disturb inferences and deductions that are supported by the record and that are the product of an orderly

---

[17] App. to Answering Br. at 251.

[18] *Long v. Div. of Family Servs.*, 41 A.3d 367, 370 (Del. 2012) (citing *Powell v. Dep't of Servs. For Children, Youth & Their Families*, 963 A.2d 724, 731 (Del. 2008); *Solis v. Tea*, 468 A.2d 1276, 1279 (Del. 1983)).

[19] *Long*, 41 A.3d at 370 (citing *Powell*, 963 A.2d at 731; *In re Stevens*, 652 A.2d 18, 23 (Del. 1995)).

and logical deductive process."[20]  Here, Father's testimony that he recently traveled overseas for the Air Force, whether voluntarily or not, showed that his position involves international travel over which he has limited, if any, control.  Father also testified that he lives alone and does not have family support.  Given these facts, the court's finding that Father's job may require him to travel overseas and leave Child at home with non-family caregivers is supported by the record.

(15)  And finally, the Family Court did not err when it found that the transient nature of Father's residence could force Child to adjust to a new home in the future. Father admitted that the military could relocate him to a new location as early as 2025—even with him designated as a single parent by the military.  Father's contention that a custody order granting him primary residency could be modified later under 13 *Del. C.* § 729 to place Child with Mother if he has to move misses the mark.  An option to modify does not negate that Father may have to move nor does it render the court's finding illogical or legally erroneous.  Father overlooks that Child would still be forced to readjust to living with Mother full-time in Delaware under his proposed ability-to-modify-later scheme. The Family Court's finding that Father "could be relocated . . . at any time" forcing Child to adjust to a new home if

---

[20] *Long*, 41 A.3d at 370 (citing *Powell*, 963 A.2d at 731; *Solis*, 468 A.2d at 1279).

9

primary residency was awarded to him was therefore logical, free from legal error, and supported by the record.[21]

NOW, THEREFORE, IT IS ORDERED that the Family Court's judgment is AFFIRMED.

BY THE COURT:

/s/ N. Christopher Griffiths
Justice

---

[21] *Fam. Ct. Order* at 6.